ELLIOTT ARONSON & another *vs.* TOWN OF SHARON.

Norfolk.    October 9, 1963. — January 6, 1964.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, KIRK, SPIEGEL,
& REARDON, JJ.

*Zoning,* Validity.  *Constitutional Law,* Zoning, Police power.

On the facts respecting a rapidly growing residential town and a large,
    mostly undeveloped section thereof containing rough terrain, hills, wood-
    land, and swamps, an amendment of the town's zoning by-law rezoning
    the section as a "single residence district rural" in which the lots were
    required to have an area of at least 100,000 square feet and a width of
    at least 200 feet bore no rational relation to the objects of zoning and
    was invalid as applied to a substantial parcel located in the section,
    even if such rezoning would benefit the town as a whole by furthering
    the preservation of land in the section in its natural state for recreational
    and conservation purposes.  [603–604]
A landowner is entitled to prove that a provision of a town's zoning
    by-law is unreasonable and invalid as applied to his land without prov-
    ing also that the by-law is invalid as a whole.  [605]

PETITION filed in the Land Court on May 22, 1961.

The case was heard by *McPartlin,* J.

*Ernest C. Johnson* for the respondent.

*Robert I. Kalis* for the petitioners.

WILKINS, C.J.   The petitioners, owners of land in Sharon,
brought this petition in the Land Court pursuant to G. L.
c. 240, § 14A, and c. 185, § 1 (j 1/2), to determine the valid-
ity of a zoning by-law, which was amended by the town
meeting on March 13, 1961, and in part reads: "Section 13.
In the Single Residence Districts Rural, there shall be pro-
vided for each dwelling hereafter constructed a lot contain-
ing not less than one hundred thousand (100,000) square
feet and having a width of not less than two hundred (200)
feet."    The judge in his decision purported to "find" that
"upon taking into consideration the character of the dis-
trict, the location, size and characteristics of the land, the
nature and use of the adjoining land in the general vicinity,

. . . the zoning of the locus as a Single Residence District Rural was an invalid exercise of the authority and powers conferred on the Town of Sharon by the statute.'' This was, in part at least, a ruling. See *Pittsfield* v. *Oleksak,* 313 Mass. 553, 555. He also ruled ''that the amendment to the zoning by-law and the zoning map . . . is invalid and of no effect as to the petitioners' land.'' The respondent alleged exceptions to these rulings and to the denial of certain of its requests.

The validity of the proceedings adopting the amendment is not questioned. The by-law is assailed by the petitioners as invalid as exceeding the authority of the town to adopt zoning by-laws under G. L. c. 40A, §§ 2, 3, as amended.

Our summary is from extensive findings in the judge's decision. Sharon is in the Neponset Valley twenty-one miles southwest of Boston. Its area is 24.5 square miles or 15,686 acres. In 1945 and 1962 the population was respectively 4,073 and 10,496. The population increase between 1955 and 1960 was 30 per cent as compared with an increase of 9.8 per cent for the Boston Metropolitan area ''less the central city.'' The number of dwellings in Sharon in 1961 was 2,782. Under ''present zoning requirements'' there is land capacity for another 3,500 dwellings. Eighty-two per cent of the houses in the town are on lots of less than 45,000 square feet, and eighty-six per cent are on lots of less than 66,000 square feet. In the rural district area the number of houses built since 1945 is approximately eighty of which sixty were built on lots of one acre or less, and of which seventy-three were on lots of less than one and one-half acres. Near the center of the town is a large body of water, known as Massapoag Lake, which provides recreational facilities for the town and sites for numerous charitable summer camps. There are two fish and game clubs and a wildlife sanctuary.

Sharon is a residential town with one small industry, a box company which has been in existence for over a century. A section zoned for industry has not been so used and is vacant land. There are two business centers, re-

spectively four and five miles from the locus. The nearest school is three and one-half miles distant. Route 1, a national highway, is approximately seven miles by road from the petitioners' land. There is no sewerage system in Sharon. Water has not been extended to most areas zoned as "Single Residence District Rural," but is available on Mansfield Street, an accepted public highway abutting the locus.

The "Single Residence District Rural" forms a jagged crescent in the southerly part of Sharon bordering on Easton, Mansfield, and Foxboro, and contains 4,811 acres. This area is little developed and does not differ much from the "Single Residence District"[1] in the northwest part of the town. It is hilly, stony, and strewn with large boulders and rocks. There are rough, uncultivated and undeveloped woodland and peat swamps. Much of the area is inaccessible by public streets. The roads through the "Single Residence District Rural" run generally north and south. There is no road running east and west across the town below Massapoag Lake. In the district there are three small farms, but no large country estates, although a part of one such estate in Foxboro extends into it. The district has had little residential development, but there has been a substantial development in East Sharon and in parts of the north and northwest sections of the town.

On November 22, 1957, the date of acquisition by the petitioners, the locus was zoned for single residence lots of at least 40,000 square feet and a minimum frontage of 150 feet. Based upon the testimony of the petitioner Aronson, we ourselves find (G. L. c. 185, § 15A, inserted by St. 1963, c. 74, § 1) that this would permit a subdivision into

---

[1] Under the amended zoning by-law there are four residence districts: (1) "Single Residence District Rural" — minimum lot size 100,000 square feet, minimum width 200 feet; (2) "Single Residence District A" — minimum lot size 40,000 square feet, minimum width 150 feet; (3) "Single Residence District B" — minimum lot size 20,000 square feet, minimum width 100 feet; (4) "General Residence District" — minimum lot size 8,000 square feet, minimum width 70 feet. An examination of the zoning map shows that the judge's reference is to "Single Residence District A." There are also (5) "Business Districts" and (6) "Light Industrial Districts."

about forty-five lots, while the minimum requirements of a "Single Residence District Rural" would yield about twenty lots.

The petitioners have sold several lots in the front part of the locus, and homes have been built on them. The balance, approximately seventy acres, is back land. There is a gravel road leading in from Mansfield Street about 1,000 feet to an open field, which has been prepared in a limited way for outdoor sport activity. Beyond the field the road disappears into fairly heavy second-growth woods. Rocks and boulders are to be seen. The land could be used for building, although it is quite rocky and wet, and parts rise in grades of fifteen per cent or more.

The town has employed a professional city and town planner since 1954. In 1959 he prepared a comprehensive plan after an investigation of existing land uses, present community facilities, the water system, the feasibility of a sewerage system, and the amount of land adaptable for ready building. The plan set out the six zone districts adopted on March 13, 1961.

The plan was based both on an analysis of future traffic circulation and on the physical character of the land. As to traffic, a section of "Interstate Highway Route 95" is being constructed through the town; a relocation of the present State highway Route 27 was recommended; and the construction of a future cross-town road in the southern part of the town was anticipated. As to the character of the land, it is a mixture of Gloucester stony loam, ragged glacial hills, and swampy peat areas. The separation of this rural residence area from the rest of town as at present and by a future cross-town road was considered as creating an opportunity to cause the land in this area to be kept open and used for conservation purposes. The plan was based upon a twofold program: (1) "for the control of the land at as high a residential density as it was possible to get the town to accept"; and (2) "to initiate a positive program of land acquisition for the town itself." The population to be obtained was to be the one appropriate to the type of

land in the zone and to an orderly growth of the community.

Certain general observations are pertinent to a zoning case. The judge made them. We make them, but need not state them at length. Every presumption is to be indulged in favor of a by-law, and its enforcement will not be refused unless it is shown beyond a reasonable doubt that it conflicts with some constitutional provision or the enabling statute. Where the reasonableness of a zoning by-law is fairly debatable, the judgment of the local legislative body upon which rested the duty and the responsibility for its enactment must be upheld. *Simon* v. *Needham,* 311 Mass. 560, 564. *Foster* v. *Mayor of Beverly,* 315 Mass. 567, 572. *Caires* v. *Building Commr. of Hingham,* 323 Mass. 589, 594–595. *122 Main St. Corp.* v. *Brockton,* 323 Mass. 646, 649. *Lamarre* v. *Commissioner of Pub. Works of Fall River,* 324 Mass. 542, 545. *Concord* v. *Attorney Gen.* 336 Mass. 17, 25–26. *Schertzer* v. *Somerville,* 345 Mass. 747, 751.

In *Simon* v. *Needham,* 311 Mass. 560, a zoning by-law was upheld which required that building lots in a single residence district be of at least one acre. It was there said: "A city or town is expressly empowered to adopt zoning ordinances or by-laws 'For the purpose of promoting the health, safety, convenience, morals or welfare of its inhabitants' and to 'regulate . . . the size and width of lots' "[1] (p. 562). "The establishment of a neighborhood of homes in such a way as to avoid congestion in the streets, to secure safety from fire and other dangers, to prevent overcrowding of land, to obtain adequate light, air and sunshine, and to enable it to be furnished with transportation, water, light, sewer and other public necessities, which when established would tend to improve and beautify the town and would harmonize with the natural characteristics of the locality, could be materially facilitated by a regulation that prescribed a reasonable minimum area for house lots. The area was to be determined not only in the light of present

---

[1] G. L. c. 40, § 25, as appearing in St. 1933, c. 269, § 1. The same language is now found in G. L. c. 40A, § 2, inserted by St. 1954, c. 368, § 2, as amended.

needs of the public but also with a view to the probable requirements of the public that would arise in the immediate future from the normal development of the land. The advantages enjoyed by those living in one family dwellings located upon an acre lot might be thought to exceed those possessed by persons living upon a lot of ten thousand square feet. More freedom from noise and traffic might result. The danger of fire from outside sources might be reduced. A better opportunity for rest and relaxation might be afforded. Greater facilities for children to play on the premises and not in the streets would be available. There may perhaps be more inducement for one to attempt something in the way of the cultivation of flowers, shrubs and vegetables" (p. 563). The opinion closed with words of caution, "We make no intimation that, if the lots were required to be larger than an acre or if the circumstances were even slightly different, the same result would be reached" (p. 567).

Whether a by-law is, on the one hand, a reasonable interference with a landowner's rights undertaken in the exercise of the police power for the public benefit or is, on the other hand, a deprivation of private property without compensation often depends upon the facts of the particular case. *Pittsfield* v. *Oleksak,* 313 Mass. 553, 555. If, after making every presumption in favor of the by-law, its imposition upon a given parcel of land "has no real or substantial relation to the public safety, public health or public welfare," it cannot be so applied. *Barney & Carey Co.* v. *Milton,* 324 Mass. 440, 445. *Gem Properties, Inc.* v. *Board of Appeals of Milton,* 341 Mass. 99, 105. *Jenckes* v. *Building Commr. of Brookline,* 341 Mass. 162, 166.

The respondent argues: "The physical characteristics of the district, considered in conjunction with those of the town, a town of residences, large camps, a retreat house, fish and game clubs, a wildlife sanctuary, and large recreation and conservation areas, indicate that all that has made Sharon beautiful . . . will best be maintained by the lot size requirements of its zoning by-law. The zoning here in question will encourage leaving land in the natural state,

which will provide the inhabitants, and those who come to Sharon, with a community which has the living and recreational amenities that are fundamental to mental and physical health.'' This resembles the finding as to the second basis of the plan, namely, ''to initiate a positive program of land acquisition for the town itself'' and the finding that the separation of the rural residence area helped to create an opportunity to cause land in it to be kept and used for conservation purposes. We cannot resist the conclusion that, however worthy the objectives, the by-law attempts to achieve a result which properly should be the subject of eminent domain. As Mr. Justice Holmes said in *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393, 415–416, ''while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking. . . . [A] strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change. . . . [T]his is a question of degree — and therefore cannot be disposed of by general propositions.''

In *Simon* v. *Needham,* 311 Mass. 560, 563, quoted *supra,* are enumerated certain possible advantages of living upon an acre lot as compared with one of 10,000 square feet. While initially an increase in lot size might have the effects there noted, the law of diminishing returns will set in at some point. As applied to the petitioners' property, the attainment of such advantages does not reasonably require lots of 100,000 square feet. Nor would they be attained by keeping the rural district undeveloped, even though this might contribute to the welfare of each inhabitant. Granting the value of recreational areas to the community as a whole, the burden of providing them should not be borne by the individual property owner unless he is compensated.[1]

---

[1] Compare G. L. c. 41, § 81Q (as appearing in St. 1953, c. 674, § 7), which reads in part: ''No rule or regulation shall require, and no planning board shall impose, as a condition for the approval of a plan of a subdivision, that any of the land within said subdivision be dedicated to the public use, or conveyed or released to the commonwealth or to the county, city or town in which the subdivision is located, for use as a public way, public park or playground, or for any other public purpose, without just compensation to the owner thereof.''

There was no error in the rulings on the respondent's requests, nor in the two general rulings quoted in the first paragraph of this opinion. The first of the latter, the one stated in terms of a finding, is attacked as inadequate, but the decision must be read as a whole and enough appears to disclose the grounds on which it is based. For this we examine the treatment of the requests.

The judge granted the respondent's first request that the petitioners have the burden of proving that the zoning by-law is invalid as applied to their land, but refused the second that the petitioners have the burden of proving that the by-law is invalid. This distinction is recognized in *Barney & Carey Co.* v. *Milton,* 324 Mass. 440, 444, where it was said, "A decision sustaining the validity of a comprehensive zoning regulation does not preclude a landowner from showing that the regulation cannot be lawfully applied to a specific parcel of land in the peculiar circumstances connected with that parcel of land," citing, among other cases, *Euclid* v. *Ambler Realty Co.* 272 U. S. 365, and *Nectow* v. *Cambridge,* 277 U. S. 183. Contrary to the respondent's contention, ruling the amendment to the by-law to be "invalid and of no effect as to the petitioners' land" did not entitle the respondent to have granted its second request, which, by way of contrast, must be taken to mean invalid as a whole.

In granting the ninth request the judge ruled broadly that "The zoning of a district as Single Residence District Rural, requiring a minimum of 100,000 square feet with a width of 200 feet is not an invalid exercise of the zoning powers granted to the towns by the Massachusetts Legislature." But he refused to rule (1) that such zoning of the petitioners' land bore "a rational relation to the public safety, health, morals, welfare and convenience" (third request); or (2) that it was "a reasonable exercise of the power of zoning granted to the towns by the Commonwealth" (fourth request); or (3) that it was "valid and does not deprive the petitioners of their property without due process of law" (seventh request). These rulings are in no way inconsistent. He refused to rule (1) that "The

evidence does not warrant a finding for the petitioners'' (fifth request); or (2) that ''The evidence warrants a finding in favor of the validity of the zoning by-law as applied to the petitioners' land'' (sixth request); or (3) that ''On all the evidence, a finding that the zoning of the petitioners' land . . . bears no rational relation to the public health, safety, convenience, morals and welfare is not warranted'' (eighth request).

The result we reach is not precluded by the finding that ''The population to be obtained by the regulation was to be the one that is appropriate to the type of land in the zone and to an orderly growth of the community.''

We have not found it necessary to consider the effect of the finding that the ''Single Residence District Rural'' does not differ much from the ''Single Residence District A'' in the northwest part of the town.

*Exceptions overruled.*