KENNETH C. MAYO & others *vs.* BOSTON RENT CONTROL ADMINISTRATOR & another.

Suffolk.    February 6, 1974. — July 5, 1974.

Present: TAURO, C.J., QUIRICO, BRAUCHER, HENNESSEY, & KAPLAN, JJ.

*Rent Control.    Municipal Corporations,* Rent control, *State Administrative Procedure Act.    Equity Pleading and Practice,* Review of rent control action, Declaratory proceeding.

Review under St. 1970, c. 842, by the Housing Court of an action by the Boston Rent Control Administrator on eviction matters is a trial de novo and not an appellate hearing. [576]

A landlord was not entitled under St. 1970, c. 842, § 9 (a) (10), to evict tenants from rent controlled low and moderate income units for the purpose of enabling him to make renovations which would increase the rental value of those units. [577-582]TAURO, C.J., dissenting.

BILL IN EQUITY filed in the Housing Court of the City of Boston on February 15, 1973.

The suit was heard by *Garrity,* J.

*Arthur M. Gilman (Edward J. Lonergan* with him) for Leonard Green, trustee; *Christom G. Larsin,* for Boston Rent Control Administrator, also with him.

*Michael S. Dukakis* for the plaintiffs (*Richard M. Bluestein,* for The Dorchester Tenants Action Council, Inc., amicus curiae, with him).

HENNESSEY, J.    This is an appeal from a decree of the Housing Court of the City of Boston reversing the action of the Boston Rent Control Administrator granting the appellant (landlord) certificates of eviction against twenty-one tenants of twenty apartments in Long Wharf in the city of Boston (tenants). The landlord's applications for the certificates of eviction assigned as the basis therefor St. 1970, c. 842, § 9 (a) (10) (act). Each of the tenants filed an opposing statement. A hearing was held before a represen-

tative of the administrator, at which the landlord and tenants were represented by their respective counsel.

The administrator, in granting the applications, found "that the landlord proved an intention to renovate the units and that the nature of the work required the units to be vacated, and that such renovation was not in conflict with the provisions and purposes of the statute." On a petition for review filed by the tenants pursuant to St. 1970, c. 842, § 10, the judge of the Housing Court reversed the administrator's decision. In substance he ruled that the landlord's intentions are in conflict with the purposes of the statute. We affirm.

We examine first the nature of the review in the Housing Court. Although St. 1970, c. 842, § 10, is entitled "*Judicial Review*" it clearly provides in eviction matters for a de novo court proceeding specifically comparable to a declaratory relief proceeding under G. L. c. 231A. In this proceeding an aggrieved person may challenge the action of a rent control board or administrator. "[E]xclusive original jurisdiction over such proceedings" was lodged in any District Court having territorial jurisdiction over the locus of the controlled rental unit. By G. L. c. 185A, inserted by St. 1971, c. 843, § 1, however, the Legislature amended the exclusiveness of this grant of jurisdiction, creating the Housing Court of the City of Boston, and endowing it with jurisdiction "concurrent with the district courts and the superior court" under "so much of any . . . general or special law . . . as is concerned with the health, safety or welfare of any occupant of any place used, or intended for use, as a place of human habitation." ( § 3.)

We are thus reviewing the decision of the Housing Court judge on the evidence presented before him.[1] We are not directly concerned with the actions of the administrator.

---

[1] The State Administrative Procedure Act, G. L. c. 30A, is not applicable here. Section 14 of c. 30A provides for judicial review only of final decisions of agencies made in an adjudicatory proceeding. The administrator here is not an agency as defined in G. L. c. 30A, § 1. *Gentile* v. *Rent Control Bd. of Somerville, ante,* 343, 349 n. 6. Moreover, the tenants, although they received one in the present case, were not entitled as of right to a hearing before the administrator. *Gentile* v. *Rent*

Our inquiry is twofold: (1) whether the judge was plainly wrong in any of his findings of fact, and (2) whether the judge correctly applied the law. We concluded that there was no error. As to the first inquiry, the judge made voluntary findings of fact which clearly do not purport to be complete findings. None of these findings was plainly wrong. Indeed they were plainly correct. We have concluded from our own examination of the record, as shown below, that most of the facts of the case are undisputed. Certain further allegations of fact now urged by the landlord are not supported in the record.

Nor was there error in the judge's ruling, in reversing the administrator's decision, that the evictions here were "in conflict with the provisions and purposes of . . . [the] act." St. 1970, c. 842, § 9 (a) (10).

Most of the facts are undisputed. They are as follows. The twenty units are located in the Custom House Block, which is comprised of a total of fifty-one housing units. The building is located within an area generally controlled by the Boston Redevelopment Authority. Extensive renovation has been accomplished as to the interior and exterior of the building. The thirty-one units with which we are not directly concerned are not subject to rent control. These have been either newly built or substantially renovated under the landlord's plans to rehabilitate the entire building. Substantial work which affects the entire building has already been done, including a new roof, new elevators, a new water main service, new boilers, and a new electrical system. The evidence warrants a conclusion that the extensive renovations planned for the twenty rent-con-

Control Bd. of Somerville, supra. Accordingly, the proceeding before the administrator was not an "adjudicatory proceeding" as defined in G. L. c. 30A, § 1. Natick Trust Co. v. Board of Bank Incorporation, 337 Mass. 615, 616 (1958). First Church of Christ, Scientist, in Boston v. Alcoholic Beverages Control Commn. 349 Mass. 273, 274-275 (1965).

It is not clear from the briefs of the parties whether they considered the proceeding in the Housing Court as subject to G. L. c. 30A, or as comparable to a G. L. c. 231A proceeding. For all that appears, only the evidence produced before the administrator was presented before the judge. In any event, it makes little difference, since we have been able to establish the facts, and the conclusion which the judge reached is required as a matter of law from those facts.

trolled units will require, as the administrator found, that the units be vacant during the work.

There are certain disputed assertions of facts. The landlord contends that the Boston Redevelopment Authority threatened to take the building by eminent domain unless the renovations were accomplished. The landlord appears to urge also, although it is not entirely clear, that the proposed renovations have been shown to be necessary for continued occupancy of the twenty units. As shown later in this opinion, we believe that neither of these contentions is supported by the evidence.

Under § 9 (a) the act sets out nine specific grounds, as shown in the margin,[2] for eviction from a unit subject to rent control. None of these has any application to this case. There is a tenth and more general ground on which the administrator purported to act in this case. This (§ 9 [a][10]) authorizes the granting of certificates of eviction in

---

[2] "SECTION 9. *Evictions.* (a) No person shall bring any action to recover possession of a controlled rental unit unless:

(1) the tenant has failed to pay the rent to which the landlord is entitled;

(2) the tenant has violated an obligation or covenant of his tenancy other than the obligation to surrender possession upon proper notice and has failed to cure such violation after having received written notice thereof from the landlord;

(3) the tenant is committing or permitting to exist a nuisance in, or is causing substantial damage to, the controlled rental unit, or is creating a substantial interference with the comfort, safety, or enjoyment of the landlord or other occupants of the same or any adjacent accommodation;

(4) the tenant is convicted of using or permitting a controlled rental unit to be used for any illegal purpose;

(5) the tenant, who had a written lease or rental agreement which terminated on or after this act has taken effect in a city or town, has refused, after written request or demand by the landlord, to execute a written extension or renewal thereof for a further term of like duration and in such terms that are not inconsistent with or violative of any provisions of this act;

(6) the tenant has refused the landlord reasonable access to the unit for the purpose of making necessary repairs or improvements required by the laws of the United States, the commonwealth, or any political subdivision thereof, or for the purpose of inspection as permitted or required by the lease or by law, or for the purpose of showing the rental unit to any prospective purchaser or mortgagee;

(7) the person holding at the end of a lease term is a subtenant not approved by the landlord;

(8) the landlord seeks to recover possession in good faith for use and occupancy of himself, or his children, parents, brother, sister, father-in-law, mother-in-law, son-in-law, or daughter-in-law;

(9) the landlord seeks to recover possession to demolish or otherwise remove the unit from housing use . . . ."

those cases where the landlord has "just cause" and where "his purpose [in evicting the tenant] is not in conflict with the provisions and purposes of . . . [the] act."

We need not consider to what extent, if any, the judge may exercise discretion as to what constitutes "just cause" under this section. We hold that, as a matter of law, the purpose of the eviction here is not consistent with the provisions and purposes of the act. We reach this conclusion on evidence in the record, summarized above, which is undisputed and may fairly be said to be binding on the landlord.

The declaration of emergency in § 1 of the act is an appropriate place for us to look for legislative purpose (see *Marshal House, Inc.* v. *Rent Control Bd. of Brookline*, 358 Mass. 686 [1971]), and we find that section is informative in this instance. It declares, as shown in full in the margin,[3] that there is a serious housing emergency, particularly in urban areas, and that the emergency has resulted in a "substantial and increasing shortage of rental housing accommodations *for families of low and moderate income*" (emphasis supplied). The tenants point out that the language in the declaration of emergency with respect to housing for families of low and moderate income does not appear in the original Boston rent control enabling act, St. 1969, c. 797. From this, they argue, correctly we think, that it can be inferred that in accepting the act in 1970 the city council and the mayor were adding to the expressed purposes of rent control in Boston by incorporating in the

___

[3] "SECTION 1. *Declaration of Emergency.* The general court finds and declares that a serious public emergency exists with respect to the housing of a substantial number of the citizens in certain areas of the commonwealth but especially in the cities of the commonwealth regardless of population and towns with a population of fifty thousand or over, which emergency has been created by housing demolition, deterioration of a substantial portion of the existing housing stock, insufficient new housing construction, increased costs of construction and finance, inflation and the effects of the Vietnam war, and which has resulted in a substantial and increasing shortage of rental housing accommodations for families of low and moderate income and abnormally high rents; that unless residential rents and eviction of tenants are regulated and controlled, such emergency and the further inflationary pressures resulting therefrom will produce serious threats to the public health, safety and general welfare of the citizens of the aforementioned communities and in other communities adjacent to them; that such emergency should be met by the commonwealth immediately and with due regard for the rights and responsibilities of its local communities."

new rent control scheme for the city the specific reference to low and moderate income housing which had not been included in the 1969 law.[4]

From the plain language of § 1 it is clear that one of the principal purposes of the act is to preserve and expand the supply of housing for families of low and moderate income. The record establishes that the twenty units presently carry rents from $145 to $315 a month. If the proposed renovation takes place, rents on the units will increase by at least $120 to $125 a month. Both parties have clearly assumed in their briefs and arguments that this will remove the apartments from the low and moderate rental market. Presumably, this change will be permanent. This result would be in conflict with what is clearly a central purpose of the act. Nor would the proposed rehabilitation meet the spirit and intent of the act in any way calculated to mitigate the loss to the market of twenty low and moderate rental units. The total number of available units, at any and all rental levels, would not be increased by the rehabilitation; the net effect would be to convert twenty low and moderate rental units into twenty high-rent units. Clearly the administrator could not validly permit evictions in these circumstances, as the trial judge ruled.

We cannot accept the landlord's argument that the rehabilitation is required by reason of the units' deterioration. The landlord emphasizes evidence which he presented before the administrator and which was incorporated in the Housing Court record showing that the apartments, which were constructed in the 1940's, have plumbing which needs modern replacements and have unsafe firewalls. However, there is no evidence whatsoever that public authorities have directed that any changes must be made

---

[4] In much the same vein, the judge reasoned that § 9 follows closely the rent control law formerly in effect in New York as shown in 65 McKinney's Cons. Laws of N. Y. Anno. § 8585. He found significance in that the New York law included a specific provision for eviction "for the immediate purpose of substantially altering or remodeling . . . [the premises]," and that § 9 did not include such a ground. Therefore he inferred a conscious deletion by the Massachusetts drafters, which in turn would weigh against inferring such a ground from the general language of the "just cause" clause. There is some validity to this reasoning, but the landlord argues with considerable conviction that there are other dissimilarities between the two statutes which cast doubt on the judge's inference.

in the interests of health or safety. All of the evidence presented before the Housing Court is consistent with the obvious purpose of the intended evictions, viz.: to rid the units of tenants in order that, after rehabilitation, the units will bring substantially higher rents. The evidence does not warrant a conclusion that the units will be unsuited for occupation, as at present, unless rehabilitated. Thus, in all the circumstances shown in the record we consider it fair to treat this as a case which presents the single issue of whether evictions may be ordered, not for necessary maintenance, but for optional upgrading of the apartments. Our conclusion is that evictions may not be ordered for that purpose.

It does not follow, as the landlord argues, that it is left with the option of either demolishing the units or allowing them to deteriorate for lack of repair. For all that appears, necessary repairs may be done without evictions. Also, § 7 (a) of the act guarantees a "fair net operating income" to the landlord, and this must necessarily provide for essential repairs.

Other arguments of the landlord are not convincing. He contends that in some manner the rehabilitation of the twenty units was ordered by the Boston Redevelopment Authority under threat of a land taking. This is not shown in the record; correspondence from the Authority to the landlord at best extended praise for the rehabilitation. The landlord also argues that the units not subject to rent control have already been renovated at great cost, and that it would be incongruous to deny similar treatment to the remaining twenty units. The short answer to this is that the work on the other units was commenced without prior guaranties as to rent control by any public official and that the functions of the administrator and the court cannot thus be foreclosed in advance.

We recognize that the act probably has the effect in this instance, and others, of preventing the earning by the landlord of the maximum profit which these twenty units might yield in an uncontrolled market. It is not for this court to consider any argument addressed to the desirability of the statute. The parties are of course entitled to

full protection of their rights under such a law. Additionally we must, with full regard for the acute conditions which necessitated the act, give most careful consideration to the effect of our decision on the shortage of low and moderate income housing. Cf. *Post* v. *Cashin*, 323 Mass. 316, 318 (1948); *Russell* v. *Treasurer & Recr. Gen.* 331 Mass. 501, 509 (1954).

*Decree affirmed.*

TAURO, C.J. (dissenting). I am cognizant of the skill and scholarship apparent in the majority opinion, but I must respectfully dissent. Only recently we reaffirmed the fundamental canon of statutory construction that "[w]e must construe . . . [a] statute, 'if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score.' " *Commonwealth* v. *Lamb, ante*, 265, 269 (1974). The majority have adopted the Housing Court's interpretation of the "just cause" provision of the act (St. 1970, c. 842, § 9 [a] [10]). In my opinion, that interpretation, as applied to the facts in this case, raises a serious question whether constitutional prohibitions against the taking of private property without compensation have been violated. I would follow the administrator's interpretation, for it avoids constitutional doubts. Yet it is reasonable and consistent with the provisions and purposes of the act.

I am aware of the consistency with which State rent control statutes have been upheld as proper exercises of police power in times of public emergencies. *Block* v. *Hirsh,* 256 U. S. 135 (1921). *Marcus Brown Holding Co. Inc.* v. *Feldman,* 256 U. S. 170 (1921). *Edgar A. Levy Leasing Co. Inc.* v. *Siegel,* 258 U. S. 242 (1922). *Eisen* v. *Eastman,* 421 F. 2d 560 (2d Cir. 1969). *Israel* v. *City Rent & Rehabilitation Admn. of the City of New York,* 285 F. Supp. 908 (S. D. N. Y. 1968). Indeed, we have upheld against constitutional assaults the 1953 rent control statute (St. 1953, c. 434) and the 1970 rent control statute applicable to this case. *Russell* v. *Treasurer & Recr. Gen.* 331 Mass. 501, 507 (1954). *Marshal House, Inc.* v. *Rent Control Bd. of Brook-*

*line,* 358 Mass. 686 (1971). However, we are not thereby foreclosed from declaring unconstitutional any action taken or contemplated under the act on a particular set of facts. *Barney & Carey Co.* v. *Milton,* 324 Mass. 440, 444-445 (1949). *Grosso* v. *Board of Adjustment of Millburn,* 137 N.J.L. 630 (1948).

The only justification for governmental interference with the private relationship between landlord and tenant through control of rents and evictions is that a public emergency exists. In view of the legislative declaration of such emergency, I do not question its existence. St. 1970, c. 842, § 1. But even in so grave an emergency as the extensive housing shortage caused during World War II by the reduction of residential construction and the massive demobilization of veterans, individual constitutional rights were recognized to exist. *Bowles* v. *Willingham,* 321 U. S. 503, 519, 521 (1944). *Woods* v. *Cloyd W. Miller Co.* 333 U. S. 138.[1]

It is imperative that so basic a constitutional right as the right of an individual to use and enjoy his own property[2] must be protected vigilantly against unconstitutional erosion from zealous exercises of the police power by a Legislature determined to solve a difficult public problem. That protection extends to an unconstitutional interpretation of a statute. Although it cannot now be doubted

---

[1] In the *Bowles* and *Woods* cases, the Supreme Court of the United States upheld the constitutionality of Federal rent control acts and allowed private property rights to be subordinated to the stringent demands imposed on the nation's resources by the war. After the full impact of World War II had passed, the court admitted its reluctance, in the context of war, to grant private property rights the full measure of protection guaranteed by the United States Constitution. *United States* v. *Central Eureka Mining Co.* 357 U. S. 155, 168 (1958).

[2] The right to the protection of private property is preserved not only in the Fifth and Fourteenth Amendments to the Constitution of the United States, but also in the Massachusetts Constitution. In art. 1 of the Declaration of Rights, the right "of acquiring, possessing, and protecting property" is declared to be one of man's "natural, essential, and unalienable rights." Article 10 thereof declares that "[e]ach individual of the society has a right to be protected by it in the enjoyment of his . . . property, according to standing laws. . . . [N]o part of the property of any individual can, with justice, be taken from him, or applied to public uses, without his own consent, or that of the representative body of the people. . . . And whenever the public exigencies require that the property of any individual should be appropriated to public uses, he shall receive a reasonable compensation therefor."

that the State has the power to control rent and evictions
during a public emergency, that power is subject to impor-
tant constitutional limitations. The Supreme Court of the
United States recognized these limitations in the *Block*
case, cited above, in which the court upheld the validity of
the rent control law applicable to the District of Columbia.
Writing for the court, Mr. Justice Holmes stated: "[A]
public exigency will justify the legislature in restricting
property rights in land *to a certain extent* without com-
pensation. . . . Housing is a necessary of life. All the
elements of a public interest justifying *some degree* of
public control are present. The only matter that seems to us
open to debate is *whether the statute goes too far.* For just
as there comes a point at which the police power ceases and
leaves only that of eminent domain, it may be conceded
that regulations of the present sort *pressed to a certain
height* might amount to a taking without due process of
law" (emphasis supplied). *Id.* at 156.

The implicit warning in the *Block* case, that State police
power must be exercised cautiously, was brought home
emphatically in *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S.
393 (1922). There the court declared unconstitutional a
Pennsylvania statute forbidding the mining of anthracite
coal in such a way as to cause subsidence of a dwelling.
Again writing for the court, Mr. Justice Holmes declared
that the *Block, Marcus Brown Holding Co.* and *Levy
Leasing Co.* cases, upholding the validity of local rent
control acts, had gone "to the verge of the law." *Id.* at 416.
In forceful language, he pointed out the danger of private
property rights being consumed by the police power:
"[T]he Fifth Amendment presupposes that . . . [private
property] is wanted for public use, but provides that it shall
not be taken for such use without compensation. . . . When
this seemingly absolute protection is found to be qualified
by the police power, the natural tendency of human nature
is to extend the qualification more and more until at last
private property disappears. But that cannot be accom-
plished in this way under the Constitution of the United
States. The general rule at least is, . . . if regulation goes too

far it will be recognized as a taking." *Id.* at 415. Whether governmental action restricting the use of land and diminishing its value "goes too far" is a matter of degree and depends on the particular facts of the case. *Pennsylvania Coal Co.* v. *Mahon, supra,* at 416. *United States* v. *Causby,* 328 U. S. 256, 262 (1946). *United States* v. *Central Eureka Mining Co.* 357 U. S. 155, 168 (1958). *Aronson* v. *Sharon,* 346 Mass. 598, 603 (1964). *State* v. *Johnson,* 265 Atl. 2d 711, 714-715 (Maine 1970). *Grosso* v. *Board of Adjustment of Millburn,* 137 N. J. L. 630, 633 (1948). *Miller* v. *Beaver Falls,* 368 Pa. 189, 194, 196-197 (1951).

Examination of the facts and circumstances of the instant case establishes that the denial of certificates of eviction so severely restricts the landlord's use and enjoyment of his property as to constitute a pro tanto taking for which he is entitled to be compensated. Under the act the landlord can use his property only in the following ways: he can devote it to "use and occupancy of himself" or his family ( § 9 [a] [8]), use it for some nonhousing purpose ( § 9 [a] [9]), demolish it ( § 9 [a] [9]), or continue to rent the twenty units. While these options may realistically exist in other instances, they are illusory here. Obviously, the landlord or his family could not occupy all twenty rental units. It is unrealistic to assume that the twenty units could be converted to a nonhousing use. Aside from the enormous expense involved in such an undertaking, the probable adverse effect such a radical alteration would have on the residential environment would probably reduce the rental value of the other thirty-one units in the building. The option to demolish the property is no option at all. The practical effect of denying the certificates of eviction in this case is to compel the landlord to dedicate his property indefinitely[3] to tenants of low and moderate income. For the time being, the landlord's twenty rental units have, in

___

[3] True, the act provides it will terminate on April 1, 1975 (St. 1970, c. 842, § 13), but a time limitation is constitutionally required. *Block* v. *Hirsh,* 256 U. S. 135, 157 (1921). However, on finding that the housing emergency still exists, the Legislature can extend the operation of the act. (In fact, by amendment approved on June 13, 1974, the act has been extended to December 31, 1975. St. 1974,

effect, been converted from private to public housing. This amounts to a pro tanto taking for which the landlord is entitled to compensation. *Rivera* v. *R. Cobian Chinea & Co. Inc.* 181 F. 2d 974, 978 (1st Cir. 1950).

I do not, of course, question the need for rental accommodations for persons of low or moderate income. But I fear that important constitutionally protected *individual* rights are being sacrificed here to meet a *public* need. Such a sacrifice on the part of an individual is too great to demand no matter how urgent the public need. When private property rights are so stringently restricted, as here, the Constitution of the United States and our Constitution require that the government must pay for the use of the property. *Pennsylvania Coal Co.* v. *Mahon, supra,* at 416. *Campbell* v. *Boston*, 290 Mass. 427, 431 (1935). *Aronson* v. *Sharon*, 346 Mass. 598, 604 (1964).

The grave constitutional question raised by the majority's construction of the "just cause" provision can be avoided by a construction which supports the administrator's decision. He concluded from the evidence presented to him that "the landlord proved an intention to renovate the units and that the nature of the work required the units to be vacated, and that such renovation was not in conflict with the provisions and purposes of the statute and . . . [that] the eviction . . . [was not] retaliatory." By granting the certificates of eviction, the administrator determined that there was "just cause" for the landlord to recover possession and that his purpose did not conflict with "the provisions and purposes of . . . [the] act." St. 1970, c. 842, § 9 (a) (10). This determination is fully supported by evidence that the twenty units are in an ancient, historic and unique building in which substantial funds ($1,500,000) already have been invested to renovate

---

c. 360.) Hence, the restrictions on the landlord are for an indefinite time. Even in the absence of any extension, the imposition of substantial restraints on the use and enjoyment of property materially affecting its value, although they be imposed for a definite period of time, constitutes a taking. *Miller* v. *Beaver Falls*, 368 Pa. 189, 193-194, 196-197 (1951).

the building, and that the alterations sought to be made in those units would be consistent with the remodeling done in the other thirty-one rental units. The decision of the administrator, charged with the responsibility of administering the act (§ 5 [c]), should not be disturbed unless he has made a material error of law. I do not think he has. The administrator is in a far better position than a court to evaluate the overall housing situation in Boston and to decide whether substantial renovation of rental units, resulting in the conversion of low and moderate income units to luxury units, is consistent with the provisions and purposes of the act. *Snitkoff* v. *Temporary State Housing Rent Commn.* 31 Misc. 2d (N. Y.) 687, 688-689 (1961). I realize that the act, unlike the New York and the earlier Massachusetts rent control laws, does not in terms authorize eviction for substantial alterations or remodeling. 65 McKinney's Consol. Laws of N. Y. Anno. § 8585, 2 (c) (1961). St. 1953, c. 434, § 10 (d). But I find it significant that, unlike the present act, neither of the other rent control laws permitted eviction on the broad ground of "just cause." It is plain to me that the intent of the Legislature was to delegate to the administrator broad discretionary authority to grant certificates of eviction so long as the landlord's purpose did not conflict with the provisions or purposes of the act.[4]

---

[4] The administrator is not limited in the exercise of his discretion under § 9 (a) (10) by the specific grounds for eviction set out in § 9 (a) (1) through § 9 (a) (9). The Legislature has made this plain by specifying in § 9 (a) (10) that a tenant could be evicted from a controlled rental unit "for any *other* just cause" (emphasis supplied). Thus the intent was that this broad ground should be in addition to the specific grounds. We have very recently determined that chronic late payment of rent constituted "other just cause" under § 9 (a) (10) even though § 9 (a) (1) specifically provided for eviction for failure "to pay the rent to which the landlord is entitled." *Gentile* v. *Rent Control Bd. of Somerville, ante,* 343, 347 (1974). Consequently, we found it unnecessary to determine whether chronic late payment of rent was included in the particular ground in § 9 (a) (1). We noted that § 9 (a) (10) does not deal with a conflict between "any other just cause" and the particular causes set forth in the other nine subsections of § 9 (a).

Having in mind this appropriately broad construction of the "just cause" provision, I find unacceptable the narrow interpretation of that clause adopted by the majority in the present case. The majority reject the landlord's argument that rehabilitation is required because of the units' deterioration, noting the absence of any evidence of an order from a public authority "that any changes must be made in the interests of health or safety." *Ante,* at 580-581. Yet the majority

The landlord's purpose is, as the majority note, to upgrade the apartments. Neither the majority nor the judge of the Housing Court point to any specific prohibition in § 9 with which the landlord's purpose conflicts. The majority find a conflict between the landlord's purpose and one of the purposes of the act, i.e., to relieve the "shortage of rental housing accommodations for families of low and moderate income." St. 1970, c. 842, § 1. Undoubtedly, this is an important purpose. But we cannot ignore the conditions that led to the housing shortage: "housing demolition, deterioration of a substantial portion of the existing housing stock, insufficient new housing construction, increased costs of construction and finance, inflation and the effects of the Vietnam war." St. 1970, c. 842, § 1. The administrator may well have reasoned that denial of the certificates would have aggravated the very conditions that caused the shortage, for the landlord's alternatives would be to destroy the units or to convert them to a nonhousing use (thus reducing the number of rental units available) or to allow the property to deteriorate. See *Marshal House, Inc.* v. *Rent Control Bd. of Brookline*, 358 Mass. 686, 695 (1971).

---

acknowledge that evidence was presented to the administrator and the judge of the Housing Court that plumbing needed to be replaced and that the apartments had unsafe firewalls. *Ante,* at 580. The evidence was in the form of testimony from an architect summarized in the record as follows:

"He stated his opinion to be that the renovation was necessary. The original work in the apartments, which was done in the forties, is far below modern standards. The partitions and walls are unsafe in case of fire (one hour rather than two hour enclosures.)" Apparently, the majority require an order from some public authority requiring renovation because of a violation of law before allowing a certificate of eviction to issue for renovation purposes. It is clear that the judge of the Housing Court would impose such a requirement, for he concluded that "[t]he situation might be otherwise if renovation and rehabilitation were required and evictions practically necessary to cure housing, building or other code violations." However, there is no such requirement in the act. True, there is a provision allowing eviction of a tenant who refuses to let his landlord make necessary repairs or improvements required by law. St. 1970, c. 842, § 9 (a) (6). But, as we decided in the *Gentile* case, the "just cause" provision is not restricted or limited by the other nine subsections of § 9 (a). Therefore, the landlord did not have to show any order of a public authority that required renovation in the interest of health or safety in order to justify issuance of certificates of eviction for "just cause."

By following the broad construction of the "just cause" provision adopted by the court in the *Gentile* case, the majority could have upheld the administrator's decision to issue the certificates and would have avoided what, in my opinion, is an unconstitutional application of the act.

Furthermore, the administrator may have determined that if the landlord did not renovate when he desired to, inflation would cause the cost of such renovation to increase so greatly by the time the rent control restrictions ended that he would not be able to afford such extensive alterations. It should also be borne in mind that there is nothing in the act indicating an intention to restrict the expansion of the higher income housing market.[5] Hence, the administrator's conclusion that the landlord's purpose was not in conflict with the purposes of the act was correct. This is not to say that, absent constitutional considerations, the ruling of the judge of the Housing Court that the landlord's intentions conflicted with the purposes of the act was incorrect as matter of law. However, in view of the availability of the reasonable alternative construction of the act by the administrator, which avoids the serious constitutional issue discussed above, I accept his interpretation rather than that of the Housing Court judge. I believe it is most difficult to rationalize a position that no constitutional issue is raised by the majority view.

As I have said, I do not question the necessity that housing be made available to persons of low and moderate income. But tenants who inhabit rent controlled units do not, by virtue of the provisions in the rent control act, acquire vested rights in such units. See *Nayor* v. *Rent Bd. of Brookline*, 334 Mass. 132, 135 (1956). Yet the majority opinion here, in effect, allows the tenants to take from the landlord a substantial property interest, namely, the right to make substantial alterations on his property and to obtain correspondingly higher rents. In the face of a public

---

[5] On the contrary, it would be most harmful to the city of Boston to discourage higher income dwellings. It has been well established by experience that projects with only low income dwellings have failed miserably and have greatly increased the city's problems. The trend now is to encourage such construction as to preserve and promote a healthy mixture of affluent and poor in the community and to discourage further flight to the suburbs of higher income families. This could have been the Legislature's intent in the enactment of the statute and it is something the administrator had a right to consider in forming his judgment. Thus, there is no logical reason for the court to substitute its own judgment for that of the administrator.

emergency in the area of housing, the fundamental ques-
tion is on whom the burden of meeting the exigency should
fall. *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393, 416
(1922). In my view the landlord here is being told to
shoulder an unfair share of the burden. When considering
the question of the extent to which public needs should be
permitted to encroach on private property rights, we should
keep before us constantly the admonition of Mr. Justice
Holmes: "We are in danger of forgetting that a strong
public desire to improve the public condition is not enough
to warrant achieving the desire by a shorter cut than the
constitutional way of paying for the change." *Pennsylvania
Coal Co.* v. *Mahon, supra,* at 416.

Because of the narrow construction of the "just cause"
provision adopted by the Housing Court judge and followed
by the majority, the landlord is being required to dedicate
substantial property interests to a public use without
compensation. Since the broader interpretation of the
provision adopted by the administrator is available and
would avoid the serious constitutional question raised, I
would reverse the decision of the Housing Court and
reinstate the decision of the administrator.