**TENANTS OF 738 LONGFELLOW STREET, N.W., Petitioners,**

v.

**DISTRICT OF COLUMBIA RENTAL HOUSING COMMISSION, Respondent,**

**Estate of James Vito, Intervenor.**

**No. 89–221.**

District of Columbia Court of Appeals.

Argued Dec. 18, 1989.
Decided June 6, 1990.

Johnny Litman, for petitioners.

Frederick D. Cooke, Jr., Corp. Counsel at the time the statement was filed, Charles L. Reischel, Deputy Corp. Counsel, and James C. McKay, Jr., Asst. Corp. Counsel, filed a statement in lieu of brief for respondent.

Eric Von Salzen, for intervenor.

Before ROGERS, Chief Judge, and SCHWELB and FARRELL, Associate Judges.

SCHWELB, Associate Judge:

This is a case in which, at first blush, the posture and rhetoric of the parties appear to be the reverse of what conventionally occurs in disputes between landlords and tenants. The owner of an apartment complex insists that his property is old and decayed and in poor condition and must be substantially overhauled. His tenants say in effect that the place is not so bad at all

and that less work needs to be done than the owner claims is required.[1]

The explanation for this intriguing variation from the more usual state of affairs is that the owner proposes to "substantially rehabilitate" the property and, in connection with this proposal, seeks to obtain leave to increase the rent ceiling by more than a smidgen. In order to persuade the Rental Housing Commission that the property requires substantial rehabilitation, the owner must show that it is not in the best of shape. Although the tenants agree that some of the renovation contemplated by the landlord needs to be done, they have little enthusiasm for what they regard as largely cosmetic changes which will bring about higher rents which they may not be able to afford to pay. They understandably view parts of the proposed rehabilitation as unnecessary and the owner's professed concern that the expenditures are in the tenants' interest as little more than feigned solicitude.

The Rental Housing Commission granted the owner's petition for substantial rehabilitation and approved a 50% increase in the rent ceiling. We agree that the owner has established his right to substantially rehabilitate the building and to raise the rent ceiling accordingly, but remand for further proceedings with respect to the amount of increase in the rent ceiling.

I

## THE FACTS

The tenants of 738 Longfellow Street, N.W. seek review of a decision of the District of Columbia Rental Housing Commission. The Commission granted a substantial rehabilitation rent ceiling increase [2] to the owner of the apartment building located at that address, based on the proposed substantial rehabilitation of the premises, and held that each tenant's rent ceiling could be increased by 50%. The tenants maintain that the Commission erred in finding that the renovations proposed by the owner are "in the interest of the tenants" as required by D.C.Code § 45-2524(a) (1986).[3] The tenants also contend that even if substantial rehabilitation is appropriate, the 50% increase approved by the Commission is excessive.

The locale of this controversy is a four-story building with sixty-six apartments. It was constructed in 1950, and most of its major components have not been replaced during its forty-year history. The average monthly rent per apartment is under $300.00. The property has an assessed market value of $488,075.00.

The owner of the property, the Estate of James Vito, filed a petition for substantial rehabilitation, seeking approval of $337,521.00 in renovations [4] and a 75% upward

---

1. The present circumstances remind one of the opening bars of *United States v. Dogan,* 314 F.2d 767, 768 (5th Cir.1963):

 Here we have the unusual charge made that citizens are desirous of paying taxes and are not permitted to do so. This charge tends to become understandable when we learn that the taxes involved are poll taxes, [and] that under the constitution and laws of Mississippi there is a close tie-in between the payment of poll taxes and the exercise of the franchise ...

2. D.C.Code § 45-2503(34) (1986) provides that:

 "Substantial rehabilitation" means any improvement to or renovation of a housing accommodation for which: (A) The building permit was granted after January 31, 1973; and (B) The total expenditure for the improvement or renovation equals or exceeds 50% of the accessed value of the housing accommodation before the rehabilitation.

3. D.C.Code § 45-2524 (1986) states that:

 (a) If the Rent Administrator determines that (1) a rental unit is to be substantially rehabilitated, and (2) the rehabilitation is in the interest of the tenants ... the Rent Administrator may approve ... an increase in the rent ceiling for the rental unit, if the rent increase is no greater than 125% of the rent ceiling applicable to the rental unit prior to substantial rehabilitation.

4. The owner's renovation plan consisted of remodeling the kitchen in each apartment (replacing the floors, light fixtures, cabinets, countertops, sinks, stoves and refrigerators) and adding a new sink, vanity and medicine cabinet in the bathroom. In the common areas of the building, the owner proposed to replace the tile in the hallways with carpeting, retile the floor in the laundry room, relocate the mailboxes, and replace the front entrance door, the plumbing, the windows and the lighting fixtures in the hallways and stairwells. In the garage, the plan was to replace the light fixtures, paint the interior and restripe the parking spaces.

**1210**

adjustment in the rent ceiling. Under the owner's renovation plan, the rent ceiling increase was to be gradually phased in over a period of three years. A hearing was held on the owner's petition before one of the Commission's hearing examiners. The owner maintained that the extensive renovations proposed were necessary in order to prevent further deterioration of the building.

Johnny Litman, counsel for the tenants, who is a resident of the building, presented the tenants' concerns to the hearing examiner. The thrust of the tenants' position can be characterized in pithy vernacular as "if it ain't broke, don't fix it." The tenants divided the proposed renovations into three categories: those which they found acceptable; those which they thought were needed in some apartments, but not in others; and the remainder, which they flatly rejected as unnecessary and "purely cosmetic" —a phrase that may mean the kiss of death in "substantial rehabilitation" cases.

Following the hearing, the examiner issued an order granting the owner's petition for substantial rehabilitation but limited the increase in the rent ceiling to 60%. The tenants appealed to the Commission, which remanded the case to the hearing examiner, because he had "failed to make the necessary resolution of contested factual issues to support his conclusion that the substantial rehabilitation is in the interest of the tenants or his conclusion that a 60% increase is necessary."

On remand, a second hearing examiner, without holding another hearing, ruled that the owner's petition should be granted. The second examiner concluded, however, that the rent ceiling increase should be reduced to 52%. The tenants appealed for a second time to the Rental Housing Commission. The Commission upheld the decision of the second examiner, but slightly reduced the allowable rent ceiling increase

to 50%.[5] The tenants have petitioned this court to review the Commission's order.

## II

### THE STATUTORY AND REGULATORY FRAMEWORK

*A. The statute and the former regulation.*

■ The tenants first argue that the petition for substantial rehabilitation should have been denied because the Commission did not make findings said to be required by the applicable regulation then in effect. To evaluate the force of this contention, we must compare the former regulation with the statute pursuant to which it was promulgated.

Before a petition for substantial rehabilitation may be approved, the Rent Administrator must find, among other things, that it is "in the interest of the tenants of the unit and the housing accommodation in which the unit is located ..." D.C.Code § 45–2524(a)(2) (1986). Section 45–2524(c) provides that

[I]n determining whether substantial rehabilitation of a housing accommodation is in keeping with the interests of the tenants, the Rent Administrator shall consider, among other relevant factors: (1) The impact of the rehabilitation on the tenants of the unit or housing accommodation; and (2) The existing condition of the rental unit or housing accommodation and the degree to which any violations of the housing regulations in the rental unit ... constitute an impairment of the health, welfare, and safety of the tenants.

The statute thus makes the existence of any sub-standard conditions in the unit one of the factors which the agency must consider in determining whether a petition for substantial rehabilitation may be granted. It does not, at least by its terms, make the

5. The Commission concluded that since garage spaces are rented separately and are not provided to the tenants as part of their rent, it would be "unreasonable and unfair" to include the cost of painting and restriping the garage, $2654.00, in the total common area renovation cost, or to utilize it to increase the rent ceiling of every tenant. Finding that these garage repairs constituted 2% of the total common area expenditure, the Commission reduced the authorized increase in the rent ceiling to 50%.

existence of such conditions an indispensable element of the owner's case.

The regulation in effect when the landlord's petition was filed, on the other hand, provided that

> [t]he hearing examiner shall approve the petition for substantial rehabilitation and authorize an increase for each affected rental unit if the following facts are determined:
>
> (a) The existing conditions in the subject housing accommodation endanger the health, welfare, and safety of the tenants;
>
> (b) The conditions cannot adequately be corrected by improved maintenance and repair or limited capital improvements ...;
>
> (c) The substantial rehabilitation of the housing accommodation is in the best interests of the tenants; and
>
> (d) The proposed expenditures equal or exceed fifty percent (50%) of the assessed market value of the housing accommodation.

14 D.C.M.R. § 3511.8 (June 1986).[6] Literally construed, the former regulation would make the existence of substandard conditions which cannot be corrected by less drastic means a precondition for the granting of a petition for substantial rehabilitation.

The agency's findings in this case meet the requirements of sub-paragraphs (c) and (d) of the former regulation, but neither the hearing examiner nor the Commission made the kinds of specific determinations contemplated by sub-paragraphs (a) and (b).[7] The Commission held that findings on sub-paragraphs (a) and (b) were not required by the statute. Although the issue is not free from doubt, we agree with the Commission.

### B. The collision of two Commissions; the statute and former regulation construed.

The District's rent stabilization program is a part of a comprehensive statutory scheme which is designed to protect the rights of tenants generally and those of low or moderate income in particular. *See* D.C.Code § 45–2502(5) (1986);[8] *Hornstein v. Barry,* 560 A.2d 530 (D.C.1989) (*en banc*). The legislation was designed to remedy a critical social evil, namely a severe shortage of rental housing,[9] and it must be accorded a generous construction to achieve its purposes. *See generally Goodman v. District of Columbia Rental Hous. Comm'n,* 573 A.2d 1293, 1297, 1299 (D.C.1990); *Revithes v. District of Columbia Rental Hous. Comm'n,* 536 A.2d 1007, 1016 (D.C.1987).

■■■ Exemptions from coverage of the rent control statute are to be narrowly construed. *Goodman, supra,* at 1297; *Revithes, supra; see also Bernstein v. Lime,* 91 A.2d 841, 843 (D.C.Mun.App.1952). We think that the provision for substantial rehabilitation in § 45–2524, which effectively permits a landlord to escape the proscriptions of the Act and substantially raise his rents, likewise ought to be given a parsimonious interpretation rather than an expansive one.

---

**6.** This regulation has been superceded by 14 D.C.M.R. § 42–4212.18 (March 1989). The new regulation is consistent with the Commission's decision in this case. The owner concedes, however, that it is the 1986 regulation that applies to this controversy.

**7.** The hearing examiner did find that rehabilitation was necessary for the building to continue to provide decent living conditions. It may be that these findings were intended to be the equivalent of those ostensibly required by sub-paragraphs (a) and (b) of the former regulation, but the issue was never addressed.

**8.** Section 45–2502(5) also lists one goal of the legislation as being to "provid[e] housing pro-

viders and developers with a reasonable rate of return on their investments." This is primarily accomplished, however, by § 45–2522, which deals with hardship petitions and seeks to assure landlords a reasonable return on their investment. *See generally J. Parreco & Son v. District of Columbia Rental Hous. Comm'n,* 567 A.2d 43 (D.C.1989).

**9.** "The shortage of housing is felt most acutely among low and moderate-income renters, who are finding a shrinking pool of available dwellings." D.C.Code § 45–2501(3) (1986) (legislative finding).

Does remedial rent control legislation, liberally construed, support the exacting requirements of the former regulation quoted above? The former Commission [10] thought so. In *Smithy–Braedon Property Co. v. Shawmut Tenants Association,* SR 110 (RHC, Dec. 22, 1982), the former Commission was presented with the question "whether a landlord has the right to substantially rehabilitate a housing accommodation over the objection of a substantial number of tenants when renovation may be desirable but is not necessary to comply with existing housing code regulations." The hearing examiner held that the Act requires denial of a petition to renovate "unless [rehabilitation] is necessary to assure the health, safety and welfare of the tenants." The former Commission held that the examiner had construed the statute correctly. It cited with apparent approval the contention of counsel for the tenants that "the statute legitimately restricts the landlord's unilateral property rights by permitting substantial rehabilitation only where a rental building is in such bad repair that the health, safety and welfare of the tenants is threatened."

In the case now before the court, however, the present Commission, without explicitly overruling *Smithy–Braedon,* reached a markedly different result. It

concluded that a literal reading of the former regulation would be contrary to the statute.[11] Rejecting the tenants' contention that all four criteria of the former regulation had to be satisfied before a rent ceiling increase based on substantial rehabilitation could be granted, the Commission reasoned that sub-sections (c) and (d) of that regulation addressed "ultimate facts," or merely restated the statutory prerequisites for the grant of a substantial rehabilitation petition. *See* D.C.Code § 45–2524, *supra,* quoted in note 3, *supra.* The Commission held, however, that subsections (a) and (b) of the former regulation, which appeared to require a showing of sub-standard conditions not correctable without substantial rehabilitation, were both "subsidiary criteria." According to the Commission, a showing that such conditions existed would tend to establish that the renovations were in the tenants' interest, but the lack of such a showing was not fatal to the petition. The Commission concluded

> that a substantial rehabilitation is in the interest of the tenants can still be established by proof which falls short of establishing [3511.8(a)] or [3511.8(b)] but which persuades the Rent Administrator that the interest of the tenants nevertheless will be served.

**10.** The membership of the Rental Housing Commission changed following the passage of the Rental Housing Act of 1985. *See* D.C.Code § 45–2511 (1986); *Temple v. District of Columbia Rental Hous. Comm'n,* 536 A.2d 1024, 1038–39 (D.C.1987).

**11.** The Commission said:

> Title 14 DCMR 3511.8 upon which the appellants rely heavily is even more confused. It states that the Rent Administrator shall approve a petition if all four of the stated criteria are met. However, it is clear that criteria (c) and (d) are merely a restatement of the two fundamental criteria of § 215(a)(1) and (2), D.C.Code § 45–1525(a)(1) and (2), and if these two are otherwise found to be met, the petition must be approved in any event, without regard to criteria (a) or (b). The matters covered in (a) and (b) are simply among those relevant factors which the Act in § 215(c), D.C.Code § 45–1525(c), requires the Rent Administrator to consider in determining whether the ultimate criterion (interest of the tenants) has been met. The presence or

absence of one or the other is not necessarily fatal to the petition.

Although the phrasing of the opinion might have been clearer, we are satisfied that the Commission was noting—as we note here—that since the statute itself requires approval of a petition if the two statutory criteria have been satisfied, any "literal" interpretation of the former regulation which required additional facts to be shown would be contrary to the statute. With due respect to our dissenting colleague, we think that this is a reasonable basis for not following the former Commission's approach in *Smithy–Braedon, supra.*

The dissent also suggests, at 1222 n. 6, that we seek to "have it both ways" by holding that the existence of conditions constituting a danger to tenants' health, safety or welfare is an important factor to be considered by the Commission but not indispensable to the approval of a petition for substantial rehabilitation. It is our view, however, that fidelity to the statutory language compels that approach. Our adherence to it is in general conformity with the Commission's analysis.

■ This court accords great deference to the interpretation by an agency of a statute or regulation which it administers, and the Rental Housing Commission is no exception. *Winchester Van Buren Tenants Ass'n v. District of Columbia Rental Hous. Comm'n*, 550 A.2d 51, 55 (D.C.1988). We will reject the Commission's interpretation of its regulations only if it is plainly wrong or incompatible with the statutory purposes. *Remin v. District of Columbia Rental Hous. Comm'n*, 471 A.2d 275, 279 (D.C.1984). The deference which courts owe to agency interpretations of statutes which they administer is, of course, at its zenith where the administrative construction has been consistent and of long standing, and plummets substantially when these attributes are lacking. *Superior Beverages, Inc. v. District of Columbia Alcoholic Beverage Control Bd.*, 567 A.2d 1319, 1325 (D.C.1989); *Atwater v. District of Columbia Dep't of Consumer & Regulatory Affairs*, 566 A.2d 462, 468 (D.C. 1989). Nevertheless, the present Commission is not precluded from overruling its predecessor's decisions. *Blacknall v. District of Columbia Rental Hous. Comm'n*, 544 A.2d 710, 712 n. 2 (D.C.1988). For the reasons stated below, we cannot say that its interpretation is plainly wrong.

■ This court has stated that "it is axiomatic that a regulation [must] be consistent with the statute under which it was promulgated." *District of Columbia v. Catholic University of America*, 397 A.2d 915, 919 (D.C.1979); *see also Anderson v. Davis*, 553 A.2d 648, 650 n. 6 (D.C.1989). We have held that "a regulation which create[s] a rule out of harmony with the statute is a mere nullity." *District of Columbia v. Jones*, 287 A.2d 816, 818 (D.C. 1972) (quoting *Manhattan General Equipment Co. v. Commissioner of Internal Revenue*, 297 U.S. 129, 134, 56 S.Ct. 397, 399, 80 L.Ed. 528 (1936)); *see also Dixon v. United States*, 381 U.S. 68, 74, 85 S.Ct. 1301, 1305, 14 L.Ed.2d 223 (1965). In *Manhattan General Equipment Co., supra*, the Supreme Court held that a "statute defines the rights of the [parties] and fixes the standard by which the rights are to be measured. The regulation constitutes only

a step in the administrative process. It does not, and could not, alter the statute." 297 U.S. at 135, 56 S.Ct. at 400. Just as statutes should be construed in a manner that not only upholds their constitutionality but also steers clear of uncertainty on that score, *Lynch v. Overholser*, 369 U.S. 705, 710–11, 82 S.Ct. 1063, 1067–68, 8 L.Ed.2d 211 (1962); *Kelsey v. Weinberger*, 162 U.S. App.D.C. 159, 165, 498 F.2d 701, 708 (1974), so a regulation should be interpreted, if possible, in a manner which avoids real or potential conflict with the statute pursuant to which it was promulgated.

The literal construction of the former regulation urged on us by the tenants, however, would mean that there could be no substantial rehabilitation rent ceiling increase absent a finding that the present conditions of the dwelling *in fact* endanger the health, welfare and safety of the tenants and that such conditions cannot be corrected by maintenance or capital improvements. The tenants' interpretation would make the regulation significantly more restrictive than, and therefore inconsistent with, the very statute that it was designed to implement. Under the statute, the existence of substandard conditions is a factor to be considered; under the tenants' "literal" interpretation of the former regulation, it becomes a *sine qua non*. Accordingly, notwithstanding the virtues of literalism, and without exaggerating its pitfalls, *see J. Parreco & Son v. District of Columbia Rental Hous. Comm'n*, 567 A.2d 43, 45–47 (D.C.1989), we sustain the Commission's construction.

Lest we be misunderstood, our holding that a petition for substantial rehabilitation may be approved without proof that existing conditions constitute a danger to the tenants' health, safety and welfare which cannot be remedied without major renovations does not mean that the existence or non-existence of such conditions is irrelevant. On the contrary, we think that this must be one of the Rent Administrator's principal areas of inquiry. If such conditions do not exist, and if they are not likely to develop in the near future unless major renovations are made, it will be very diffi-

cult indeed for the landlord to establish that substantial rehabilitation, with its concomitant rent increases, is in the best interest of the incumbent tenants. That other, richer tenants might benefit is not sufficient.

In *Mayo v. Boston Rent Control Administrator*, 365 Mass. 575, 314 N.E.2d 118 (1974), a landlord attempted to evict twenty-three tenants residing in housing subject to rent control for the purpose of rehabilitating the property and subsequently charging substantially higher rents. The evidence did not establish that the units would be unsuited for occupancy if they were not rehabilitated. The Supreme Judicial Court of Massachusetts affirmed the trial court's decree prohibiting the proposed evictions. The court stated that

> we consider it fair to treat this as a case which presents the single issue of whether evictions may be ordered, not for necessary maintenance, but for optional upgrading of the apartments. Our conclusion is that evictions may not be ordered for that purpose.

*Id.* at 581, 314 N.E.2d at 122.

 The present case differs from *Mayo* in that the proposed renovation can be accomplished without eviction of the tenants. Nevertheless, the raised rent ceilings may result in the tenants' eventual involuntary departure, and the reasoning in *Mayo* that optional upgrading may not be used to defeat the policies of the rent control statute has some application. Although a showing of present danger to health, safety and welfare, not remediable by lesser measures, is not indispensable to the owner's case, the statute does not authorize substantial rehabilitation leading to higher rents for optional ' or cosmetic changes which will render the property more attractive, but which will ultimately result in the replacement of tenants of low or moderate income by a more affluent clientele.

## III

## THE MERITS

### A. *The Legal Standard.*

 In order to be entitled to a substantial rehabilitation rent ceiling increase, a property owner must show that the total cost of the proposed rehabilitation of the premises equals or exceeds 50% of the assessed market value of the property and is in the interest of the tenants. *See* D.C. Code §§ 45–2503, 45–2524(a), *supra*, quoted in notes 2 and 3. Once these requirements have been met, the property owner is entitled to a rent ceiling increase which may not exceed 125%. D.C.Code § 45–2524(a)(2), *supra* note 3.

In the present case, it is uncontested that the assessed market value of the property is $488,075.00. To satisfy the 50% requirement of § 45–2503, the renovations proposed by the owner must total at least $244,037.50. The owner's proposed expenditure for the renovations is $337,-521.00. The Commission approved $332,-270.00 in renovations. The tenants assert, however, that expenditure of only $182,-618.00 is necessary and in their interest, so that the owner has not met the statutory threshold.[12]

 Our standard of review with respect to the Commission's allowance or non-allowance of the landlord's various proposed renovations is governed by the applicable provision of the District of Columbia Administrative Procedure Act, D.C.Code § 1–1510 (1987). Section 1–1510 provides, in pertinent part, that this court may set aside an agency decision which is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law ... or unsupported by substantial evidence in the record of the proceedings before the court." D.C.Code § 1–1510(a)(3)(A). The agency must address each "material contested issue" of fact, and each of the findings must be supported by substantial evidence. D.C.

**12.** The generally uncontested repairs include replacement of all of the windows in the building ($52,578.00); replacement of the water pipes ($70,250.00); removal . ($2160.00) and replacement ($9450.00) of the kitchen floors in 54 apartments; and the replacement of the refrigerators ($27,588.00) and stoves ($20,592.00) in each unit.

Code § 1–1510(a)(3)(E); *George Washington University v. District of Columbia Bd. of Zoning Adjustment*, 429 A.2d 1342, 1345 (D.C.1981).

So long as it acts in conformity with the governing statute, the Commission, which is presumed to have expertise in this arcane area, *see Winchester Van Buren Tenants Ass'n, supra*, 550 A.2d at 52, has broad discretion to determine whether rehabilitation is or is not needed. In exercising this discretion in the present case, the Commission recognized that

> [s]ome judgment must ... be made as to the benefit to be received by the tenants as against the additional rent to be imposed. This may require a determination as to whether the 50% figure was achieved by simply including in the rehabilitation plan cosmetic improvements with little or no benefit to the tenants.

The Commission further stated that

> if it were shown that a landlord neglected his property for an extended period, permitting it to deteriorate and the level of expenditure needed to rectify the defects to rise, it would seem that the landlord should not be permitted to profit from his own malfeasance.... Conversely, however, it makes little sense to deny a landlord who has maintained his property in reasonable condition but who is faced with an older building suffering from deterioration ... the right to substantially rehabilitate those portions that reasonably and fairly require it.

We think that the quoted passages correctly articulate the applicable legal principles.[13]

The tenants have argued throughout these proceedings that certain of the proposed renovations were not in their interest, essentially by virtue of the very fact of the tenants' opposition to them. They complain in particular that the landlord could not have been giving much thought to their interests, because he did not consult them as to what their preferences were. Section 45–2524, however, is not a tenant-consent provision, and the approval of the tenants as such is not required. The statute differs in this respect from others in which the consent of the tenants, or of some prescribed percentage of them, is the controlling factor. *See, e.g.*, D.C.Code §§ 45–1611(a) (consent of majority of tenants required for conversion to condominium use), 45–2525 ("voluntary" rent ceiling increase may be based on consent of 70% of the tenants). Accordingly, we conclude that it is sufficient for the landlord to show that the proposed rehabilitation is in the tenants' interest in the sense that they receive a benefit, and that the renovations are necessary to correct or improve the condition of the property.[14]

## IV

## THE TENANTS' OBJECTIONS

At the hearing, the tenants attacked each of the contested replacements and repairs on an item-by-item basis. They introduced photographs of different apartments in the building to show that cabinets, countertops and other items were still functional and that their replacement was unwarranted.

The Commission approved many of the proposed renovations to which the tenants objected on the basis of its examiner's finding that

---

13. The Commission also stated that "the interest of the tenants is not the controlling factor, but is, as required by the Act, only one factor to be balanced against the right of the landlord to the use and improvement of his property." The tenants have not specifically challenged this statement, and we need not now determine whether it is correct. We do note, however, that according to the plain language of the statute, a showing that "substantial rehabilitation" is in the interest of the tenants is indispensable before a petition may be granted.

14. We agree with the Commission, however, that a landlord's prospect for securing approval of his proposal are (and in fairness ought to be) substantially enhanced if he consults with the tenants and secures their views. Although disputes such as this must be resolved in the final analysis by an impartial tribunal, we think it unduly paternalistic to operate on the assumption that the landlord can know what is best for the tenants without asking them. The tenants' perception of their own interest is not conclusive, but must be accorded serious consideration before the agency's determination is made.

[r]ehabilitation of the housing accommodation is in the interest of the tenants because rehabilitation is ˙necessary for the building to continue to provide decent living conditions.... Many of the building systems and components have reached or exceeded their normal life expectancy, and, unless substantial rehabilitation is done, the building will deteriorate....

The tenants now contend that the Commission improperly approved a number of expenditures which, contrary to the hearing examiner's findings, were not necessary in order to provide decent living conditions or to avoid deterioration of the building.

We have carefully reviewed the record with respect to the various specific parts of the rehabilitation plan as to which issue has been joined. As to several of them, we conclude that the evidence fully supports the Commission's findings and conclusions. With respect to others, we believe that additional findings are necessary, and therefore remand to the Commission for further proceedings.

We address each contested item in turn.

(a) Kitchen Renovations.

 The hearing examiner's finding that replacement of the kitchen countertops, cabinets and sinks was necessary was based on the testimony of Mr. Richard Jurney, vice-president of Smithy–Braedon Property Company, which manages the building. Mr. Jurney testified without contradiction that all or most of the appliances and furnishings in the kitchens were installed in 1950 and have never been replaced. Specifically, he stated that new kitchen sinks and countertops were needed because the original ones have become chipped and stained over the years, that the

faucets are so old that it is impossible to find replacement parts, and that the kitchen cabinets are in constant need of repair.[15]

On cross-examination, Mr. Jurney asserted that the kitchen renovations are also necessary in order ·to replace the water pipes ("risers") which run behind the kitchen cabinets in each apartment. He testified that removal of the risers would probably damage the kitchen equipment and make reinstallment impracticable. The tenants now assert that, after being charged with a housing code violation as a result of inadequate water pressure, the owner recently replaced one-half of the pipes in the building without removing the kitchen cabinets, countertops or sinks in each apartment, and that removal of these items would once again be unnecessary in order to replace the risers.[16]

The tenants' contention about recent repairs was not raised by them at the hearing, and we have found no evidence in the record to support their claim. In any event, the hearing examiner's finding that the kitchen renovations are necessary and will benefit the tenants is supported by Mr. Jurney's testimony that the kitchen furnishings are generally in a state of disrepair and have exceeded their normal useful life. The Commission's decision on this item must therefore stand.

 If the cost of replacing the kitchen countertops, cabinets and sinks in each apartment ($95,120.00) is added to the total proposed expenditure for the uncontested renovations ($182,618.00) the total is $277,-738.00, which substantially exceeds half of the assessed value of the property. This expenditure alone, therefore, satisfies the statutory minimum requirement for granting a rent ceiling increase based on sub-

---

15. The tenants assert that Mr. Jurney's testimony was not to be credited because he rarely visited the building and was unfamiliar with it. Credibility determinations, however, must be made by the trier of fact, who heard the evidence and had the opportunity to assess the demeanor of the witnesses, rather than by appellate judges, who are limited to a cold record. See, e.g., Harris v. District of Columbia Human Rights Comm'n, 562 A.2d 625, 629–30 (D.C. 1989).

16. At the hearing the tenants argued that not all apartments in the building have kitchen countertops which could be replaced. However, Mr. Jurney testified that even in those apartments which do not presently have "butcher block" countertops, a countertop would be installed adjacent to the sink or basin in each apartment.

stantial rehabilitation of the property. We address the other contested renovations only in relation to the amount of the rent ceiling increase to which the owner is entitled.

### (b) Bathroom Vanities.

 The hearing examiner also credited Mr. Jurney's testimony that the sinks in the bathrooms require replacement. While the tenants do not dispute this finding, they assert that the proposed addition of a vanity and medicine cabinet is "purely cosmetic." The examiner found, however, that the added expense for the vanity was "reasonable and justified by the resulting improvement to the appearance of the bathrooms and improved storage space." The Commission agreed. Although a reasonable person might differ with this conclusion, for "improvement to the appearance" is arguably similar to "cosmetic change," we are not prepared to say that approval of these items was arbitrary, capricious, an abuse of discretion, or contrary to law.

### (c) Floor Coverings.

 Crediting the testimony of Mr. Jurney, the hearing examiner found that the tile on the laundry room floor and in the common hallways throughout the building is "worn out" and needs to be replaced. The tenants' principal objection is that they do not wish to have carpeting in the common areas because the rugs will easily become soiled and unattractive. Female tenants also professed concern that, if carpeting were installed, they would be unable to hear intruders walking behind them in the hallways at night. The hearing examiner found these objections insufficient to rebut Mr. Jurney's testimony that replacement of the aged tile was necessary. The Commission sustained the hearing examiner. So do we.

### (d) Refurbishing the Elevator Cab.

 With respect to elevator service, the owner proposes to install a new car operating station, hall push-button station, and drop ceiling. The plan also calls for relamination of the inside of the elevator cab—a procedure which the owner's counsel described as "formica that you put on the walls, it makes an attractive finish, it [the elevator] won't need painting after that." The examiner found that refurbishing of the elevator cab would benefit the tenants because it "would reduce future maintenance expenses by eliminating the need for future painting." Although there is some force to the tenants' argument that some of these additions may be, at least partially, cosmetic in character, we are not prepared to say that the examiner's findings on this issue are sufficiently irrational to warrant our setting them aside.

### (e) Relocation of the Mailboxes.

 The hearing examiner found that the relocation of the mailboxes from the lobby and into two closets would "enhance tenant security" and "reduce the opportunities for vandalism." The tenants maintain, however, that they have experienced no vandalism or other problem with the mailboxes in their current location.[17] Moreover, the front entrance door to the building is to be replaced in order to enhance security.[18]

We are unable to discern from the hearing examiner's findings how removal of the mailboxes from the lobby would render the premises more secure. On remand, the Commission should either disallow this part of the plan or provide some elaboration of its finding with respect thereto.

### (f) Electrical Fixtures.

 Based on the testimony of Mr. Jurney, the hearing examiner found that the light fixtures in the kitchen in each apart-

---

**17.** At the hearing, an unidentified tenant stated that relocation of the mailboxes into one of the closets would intrude into one of the apartments in the building. The examiner, however, credited the testimony of Mr. Jurney that there was sufficient room for the mailboxes and that relocation would not disturb any of the apartments.

**18.** We find no error in the hearing examiner's finding that replacement of the front door would make the building more secure.

ment, in the garage, and in the hallways and stairwells throughout the building need to be replaced. Mr. Jurney testified that the principal problem with existing incandescent light fixtures in the common areas is that they do not generate enough light, and that the addition of fluorescent light fixtures would correct this problem.

On cross-examination, Mr. Jurney acknowledged that he did not know whether the current light fixtures were being operated at full capacity. Mrs. Ida Mae Isaac, the resident manager, testified that the hallway and stairwell lights are staggered, that the fixtures are in place, but that every second bulb has been removed. Her testimony was uncontradicted at the hearing, and no reason for rejecting it was advanced by either of the hearing examiners or by the Commission. If the problem could be resolved by insertion of light bulbs in the existing equipment, installation of new fixtures would be superfluous.

 The Commission also approved the expenditure of $2538.00 for the replacement of the light fixtures in the garage. In its final order, the Commission found that it would be "unreasonable and unfair" to require all of the tenants to pay for the garage renovations, and excluded from the rehabilitation plan the proposed cost of repainting the interior of the garage and restriping the parking spaces ($2654.00). *See* note 5, *supra.* The same reasoning surely also required the Commission to exclude the proposed expenditure of $2538.00 for the replacement of the light fixtures in the garage. No explanation has been provided for this apparent inconsistency.

We must, therefore, remand for a finding whether replacement of the light fixtures is necessary to generate sufficient lighting in the common areas of the building, especially in view of the apparent under-utilization of existing fixtures. Also, in order to achieve consistency with its final order reducing the rent ceiling increase from 52% to 50%, the Commission must either exclude the expenditure of $2538.00 for new lights in the garage or articulate some reasonable basis for approving it.

(g) General Contractor's Fee.

 The final proposed expenditure in the substantial rehabilitation plan is a general contractor's fee of $10,000.00, which is to be paid to the Smithy–Braedon Property Company. The examiner found that "given the size of the proposed rehabilitation project, the supervision and coordination is necessary and the proposed fee is reasonable." This finding was based solely on statements by the owner's counsel that the proposed fee, which is based on the cost of similar services in past renovation projects, constitutes compensation for securing estimates and overseeing the work of the other contractors. Counsel also stated that the property manager was to be paid $45.00 per hour, that senior members of Smithy–Braedon's staff were to be paid $75.00 per hour, and that these expenses were included in the proposed fee.

 We conclude that there is insufficient evidence in the record to support the examiner's finding that the proposed fee is justified. There was no testimony as to the approximate number of employee-hours that the general contractor would devote to the project, or as to the precise functions which its personnel would perform. In addition, the tenants contend that they are being double-charged for the same services, because Smithy–Braedon already receives compensation for managing the property. On remand, the Commission should make appropriate findings on these issues.[19]

## V

### AMOUNT OF INCREASE

 Based on the foregoing, we hold that the owner is entitled to a substantial rehabilitation rent ceiling increase, for the expenditures we have approved are well in excess of 50% of the assessed value of the property. *See* p. 1214, *supra.* The remain-

19. We recognize that large amounts of time and money should not be expended in order to fight over relatively minor items, *see Swift v. Swift,* 566 A.2d 1045, 1047 n. 2 (D.C.1989), and suggest that the proceedings on remand on this and similar issues be conducted with that consideration in mind.

ing question is the appropriate amount of increase which should be authorized. The applicable regulation provides that in determining the percentage increase which will be allowed, the hearing examiner shall be guided by certain specified criteria.[20]

Here, the Commission has approved a 50% rent ceiling increase, which includes 15% for the replacement of the plumbing,[21] 6% for the repairs to the electrical system, 25% for the renovations in the individual apartments, 2% for renovations in the common areas of the building and a 3% increase in the miscellaneous category to cover the general contractor's fee. Neither the hearing examiner nor the Commission has provided an explanation as to how these percentages were determined.

We recognize that articulation of reasons for discretionary determinations is not always easy, but we think that some explanation is required to justify the percentage increase awarded for the repairs in each category. In addition, some consideration should be given to the tenants' contention that the rent ceiling increases approved by the Commission will allow the owner to recoup his entire investment for the renovations in a very short time.[22]

## VI

## CONCLUSION

For the foregoing reasons, we remand this case to the Commission for further proceedings consistent with this opinion.

*So ordered.*

**20.** Under the provisions of 14 D.C.M.R. § 3511.10 (1986), a hearing examiner may grant increases in the rent ceiling up to 15% for replacement or repairs to the plumbing system, § 3511.10(a); 15% for repairs to the electrical system, § 3511.10(c); 25% for renovations to individual apartments, § 3511.10(f); 25% for improvements to the common areas of the building and a maximum 5% increase for miscellaneous improvements, § 3511.10(i).

**21.** The Commission found that a 15% increase in the rent ceiling was justified "because the landlord proposes a *complete replacement of the pipes throughout the building.*" (emphasis added). As the tenants correctly point out, however, the owner does not intend to replace *all* of the plumbing—only the "riser" pipes which run behind the kitchen walls in each apartment.

ROGERS, Chief Judge, dissenting:

The Council of the District of Columbia has enacted various forms of rent control legislation, all designed to assure that moderate and low income housing does not disappear from the city's housing stock. *E.g.,* D.C.Code § 45–2501(3) (1986 Repl.) (legislative finding that housing shortage is most acutely felt among low and moderate income renters); D.C.Code § 45–2502(5) (1986 Repl.) (purpose of comprehensive statutory scheme to protect rights of low or moderate income in particular). To administer its rent control laws, the Council has established a Rental Housing Commission. Of concern here is the fact that the Commission, having long interpreted its regulation in the manner urged by appellants, has now abandoned that interpretation on the basis of what can charitably be described as stilted reasoning and is probably best explained by the fact that the membership of the Commission has changed. I take no issue with the right of the Commission to change its mind. It can do so by amending its regulations so that all are on notice that its previous interpretation is no longer to control. It also can "supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *Greater Boston Television Corp. v. FCC (Greater Boston),* 143 U.S.App.D.C. 383, 394, 444 F.2d 841, 852 (Leventhal, J.), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29

**22.** For example, the tenants maintain that the 15% increase in the rent ceiling for the plumbing repairs will result in the owner recouping his entire investment in approximately two years. We note that under the regulation now in effect, 14 D.C.M.R. § 4212.10 (March 1989), when a substantial rehabilitation rent ceiling increase is granted, the property owner must recoup his investment over the amortization period of the loan which financed the renovations, or over two hundred and forty months in the absence of a loan. The Commission should determine in the first instance whether this regulation can be applied to this case in its present posture. Even if it cannot, we think that the approach reflected in this regulation may provide some useful guidance for determining the appropriate amount of a rent ceiling increase even in cases to which the new regulation does not apply.

L.Ed.2d 701 (1971).[1] The Commission has done neither here. The majority attempts to salvage the situation by advising the Commission that it must, in fact, consider the factors of the regulation that the Commission has relegated to subsidiary status. The Commission came to its conclusion on a faulty premise and without so much as a nod to its prior interpretation or a suggestion that its new interpretation better fulfills the purposes of the statute and is consistent with the intent of the Council. Accordingly, I respectfully dissent.

The Commission, in rejecting appellants' appeal, determined that the absence of the findings required in subsections (a) and (b) of the regulation[2] was not fatal since (a) and (b) are "subsidiary criteria" not essential to the grant of a petition for substantial rehabilitation and increase in rent ceiling. The Commission acknowledged that its regulations "make an effort to provide further guidance" in determining the meaning of the statutory requirement that the Rent Administrator consider "the degree to which the housing code violations impair [ ] ... the health, welfare, and safety of the tenants."[3] This requirement the Commission viewed as "certainly not free from ambiguity." Looking to its regulation, the Commission determined, on the one hand, that "14 D.C.M.R. 3511.8 is even more confused," and, on the other hand, that "it is clear that criteria (c) and (d) are merely a restatement of the two fundamental criteria of § 45–1525(a)(1) and (2), and if these two are otherwise found to be met, the petition must be approved in any event, without regard to criteria (a) and (b)." This analysis will not withstand scrutiny.

First, the Commission proceeded on the basis of an error of law. The Commission errs in concluding that because its regulation includes some factors not set forth in

---

**1.** Professor Davis notes that "[i]n the context of control of discretion" courts hold that "an agency must follow precedents or explain why not, and that is the prevailing law that applies to agencies that use precedents as guides." 4 Davis, Administrative Law, § 20:11 at 37 (1983).

In *Greater Boston, supra,* Judge Leventhal explained that the balance between judicial restraint and judicial supervision of agency action enables the courts and the agencies to be "collaborative instrumentalities of justice." 143 U.S. App.D.C. at 393–94, 444 F.2d at 851–52 (quoting *United States v. Morgan,* 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941)). He further noted that the application of the judicial supervisory function that has evolved "with the enormous growth and significance of administrative determinations in the past forty or fifty years has insisted on reasoned decision-making." *Id.* 143 U.S.App.D.C. at 394, 444 F.2d at 852.

Judicial vigilance to enforce the Rule of Law in the administrative process is particularly called upon where ... the area under consideration is one wherein the Commission's policies are in flux. An agency's view of what is in the public interest may change, either with or without a change in circumstances. But an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute.

*Id.,* 444 F.2d at 852. [footnotes of the U.S. Circuit for the District of Columbia opinions, omitted].

**2.** 14 D.C.M.R. 3511.8 (June 1986) provides:

The hearing examiner shall approve the petition for substantial rehabilitation and authorize an increase for each affected rental unit if the following facts are determined:
(a) The existing conditions in the subject housing accommodation endanger the health, welfare, and safety of the tenants;
(b) The conditions cannot adequately be corrected by improved maintenance and repair or limited capital improvements even if it requires temporary relocation of tenants as provided in D.C.Code § 45–1561(f);
(c) The substantial rehabilitation of the housing accommodation is in the best interests of the tenants; and
(d) The proposed expenditures equal or exceed fifty percent (50%) of the assessed market value of the housing accommodation.

**3.** D.C.Code § 45–1525(c)(2) (1986 Repl.) provides:

[I]n determining whether substantial rehabilitation of a housing accommodation is *in keeping with the interests of the tenants,* the Rent Administrator shall consider, *among other relevant factors:*
(1) The impact of the rehabilitation on the tenants of the unit or housing accommodation; and
(2) The existing condition of the rental unit or housing accommodation and the degree to which any violations of the housing regulations in the rental unit ... constitute an impairment of the *health, welfare and safety of the tenants.* [Emphasis added]

the statute that those factors cannot, in any manner, be controlling. The language of the statute is directly to the contrary, referring specifically to the possibility that there would be "other relevant factors." See note 3 *supra.* The Council vested the Commission with authority to promulgate regulations that are consistent with the statute. D.C.Code § 45–2512 (1986 Repl.) *See District of Columbia v. Catholic University of America,* 397 A.2d 915, 919 (D.C.1979) (citing *Tenants of 3039 Q Street, N.W. v. District of Columbia Rental Accommodations Commission,* 391 A.2d 785, 787 (D.C.1978)). Having determined that the statute is ambiguous, the Commission could properly attempt to eliminate the ambiguity by promulgating a regulation. In its decision the Commission acknowledged that the D.C. Council, in order to assure that substantial and permanent rent increases would not follow normal or deferred maintenance or even limited capital improvements, required that the rehabilitation be "truly 'substantial' " and also be in the interests of the tenants. Subsections (a) and (b) of the regulation provide some definition to the meaning of the statutory phrase "the interests of the tenants." As promulgated, the Commission's regulation does not appear on its face to be contrary to the statute. See D.C.Code § 45–2502(1) (statutory goal to protect existing supply of rental housing and prevent low and moderate income tenants "from the erosion of their income from increasing housing costs.") Indeed, the Commission has expressly found that it is not.

Second, the Commission failed to explain why, after a decade, it is abandoning its interpretation of the regulation.[4] *Cf. Cambridge Management Co. v. District of Columbia Rental Housing Commission,* 515 A.2d 721, 723 (D.C.1986) (agency must follow its own regulations); *Connecticut Light & Power Co. v. Nuclear Regulatory Commission,* 218 U.S.App.D.C. 134, 145, 673 F.2d 525, 536, *cert. denied,* 459 U.S. 835, 103 S.Ct. 79, 74 L.Ed.2d 76 (1982). In *Smithy–Braedon Property Co. v. Shawmut Tenants Ass'n,* SR 110 (RHC, Dec. 22, 1982), the Commission interpreted the regulation—all four subsections—to be fully consistent with the statute and the intent of the Council of the District of Columbia, noting in 1982 that its interpretation had been consistent for the past two years. As here, the issue in that case was "whether a landlord has the right to substantially rehabilitate a housing accommodation over the objection of a substantial number of tenants when renovation may be desirable but is not necessary to comply with existing housing code regulations." *Id.* at 2. The Commission upheld the hearing examiner's decision to deny the petition for substantial rehabilitation unless it was necessary to assure the health, safety, and welfare of the tenants, as consistent with the statute and with the regulation that is at issue in the instant case.[5] The Commission based its interpretation of the statute and regulation on the intent of the Council to prevent unnecessary displacement of low and moderate income tenants as a result of higher rent ceilings and charges that accompany substantial rehabilitation of a property. *Id.* at 3. *See* D.C.Code § 45–1661 ("The purposes of this chapter favor resolution of ambiguity by the hearing officer or a court toward the end of strengthening the legal

---

4. Although the federal Administrative Procedure Act, 5 U.S.C. § 553(c) (1977) requires federal agencies to provide a statement of the basis and purpose for agency rules, the absence of such a provision from the District of Columbia Administrative Procedure Act, D.C.Code § 1–1501 *et seq.,* (1987 Repl.) does not exempt District agencies from explaining changes in interpretation of agency regulations. When a regulation is repealed and a new regulation is promulgated, notice of the change in policy is given, but when an agency changes its interpretation of its own regulations (after years of consistent interpretation) a reasoned explanation is necessary under the rule of law. *See Greater Boston, supra,* 143 U.S.App.D.C. at 394, 444 F.2d at 852 (quoted note 1, *supra* ).

5. In *Smithy–Braedon,* the 1977 Rental Housing Act was applicable, and the regulation at issue in the instant case was, at the time, in the form of proposed regulations. The 1977 Act provided that the Rent Administrator was to consider the degree to which housing code violations impaired the health, welfare and safety of the tenants. D.C.Law 2–54, § 703(a)(1), (2), quoted in *Smithy–Braedon, supra,* SR 110 at 1.

rights of tenants or tenant organizations to the maximum extent permissible under law.").

In the instant case the Commission did not address the reasoning of its prior interpretation and only referred to *Smithy–Braedon* in a footnote, stating that "[w]e do not read the decision as requiring such a result in every situation." The result referred to was the dismissal of a substantial rehabilitation petition where "it was concluded that the renovation might be desirable but not necessary to comply with existing housing code regulations, at least as to tenants who were presently in the building." Of course, this misses the point. All petitions for substantial rehabilitation do not, as a result of *Smithy–Braedon*, have to be dismissed; those that conform to the regulatory requirements can be approved. More to the point, the rationale for the Commission's interpretation of its regulation in *Smithy–Braedon* is left unscathed. Consequently, appellants are right on the mark in pointing out that the Commission has been inconsistent in its interpretation and application of 14 D.C.M.R. § 3511.8.

To the extent that the regulation tracks the language of the statute, see D.C.Code § 45–2524(c)(2) (1986 Repl.), and has been interpreted by the Commission as valid, I am at a loss to understand how this court can affirm the Commission's new interpretation without ignoring that the Commis-

sion must be "faithful and not indifferent to the rule of law." *Greyhound Corp. v. I.C.C.*, 179 U.S.App.D.C. 228, 230, 551 F.2d 414, 416 (1977). The District government, like the federal government, has experienced a growth in the number and power of administrative agencies, and the rationale for requiring reasoned explanation for avoiding prior agency interpretations is no less applicable. *See Superior Beverages, Inc. v. District of Columbia Alcoholic Beverage Control Board*, 567 A.2d 1319, 1325 (D.C.1989) (court's deference to agency interpretation lessens when agency interpretation changes after consistent, longstanding contrary interpretation); *Atwater v. District of Columbia Dept. of Consumer & Regulatory Affairs*, 566 A.2d 462, 468 (D.C.1989) (same). In view of the Council's concern about housing for low and moderate income persons, the Commission's new "subsidiary"/"ultimate" facts interpretation is, at best, strained and, at worst, an error of law; it also is flawed for lack of a reasoned rationale. The Commission appears to want to have it both ways: the statute is ambiguous yet the regulation can provide no more guidance than the statute.[6] Its opinion is, quite simply, the intolerably terse agency view decried by Judge Leventhal. See note 1, *supra*. As such, it should be soundly rejected.[7] *See Remin v. District of Columbia Rental Housing Commission*, 471 A.2d 275, 277, 279 (D.C. 1984) (court will reject agency interpreta-

---

6. The majority also appears to want to have it both ways. While acknowledging the D.C. Council's concern about low and moderate income persons and the "severe shortage of rental housing," and stating that the provision for substantial rehabilitation should be given a "parsimonious interpretation rather than an expansive one," it, nevertheless, concludes that the Commission's reinterpretation is not plainly wrong but requires the Commission to deem as "one of the Rent Administrator's *principal areas of inquiry*" whether existing conditions constitute a danger to the tenant's health, safety and welfare. Majority opinion at 1211, 1212 & 1213–1214. The majority also acknowledges that the effect of the landlord's substantial rehabilitation may be no less than the departure of existing tenants because of the raised rents. Majority opinion at 1214.

7. The members of the Commission undoubtedly carry out their responsibilities with care. This court has not explicitly held that an agency must provide a reasoned explanation for new interpretations of agency regulations. *Cf. Citizens Association of Georgetown Inc. v. Zoning Comm'n of D.C.*, 155 U.S.App.D.C. 233, 238, 477 F.2d 402, 407 (1973) (while commission's actions entitled to a presumption of validity, it must "put forward, or the court [be] otherwise able to discern, some basis in fact and law to justify the action as consistent with reasonableness."). The rent control statutes and regulations have repeatedly changed, and hence, the issue may not have been presented to the court. It is long past time, however, for agencies of the District government to appreciate that their power is accompanied by the responsibility to explain in a reasoned and rational way changes in the prior interpretations of their regulations.

tion if it is incompatible with the statutory purposes or based on faulty legal premise); *Totz v. District of Columbia Rental Accommodations Commission,* 412 A.2d 44, 46 (D.C.1980) (court will reject agency interpretation if plainly erroneous or inconsistent with the statute).